# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
### No. ___5:10-cv-585___

MATTHEW J. SZULIK, individually and
as trustee of
the KAITLIN SZULIK TRUST,
the BRENDAN SZULIK TRUST, and
the KEENAN SZULIK TRUST,
KYLE M. SZULIK, and
RAYMOND W. SZULIK,

        Plaintiffs,

    v.

TAG VIRGIN ISLANDS, INC.
(formerly Taurus Advisory Group, LLC),
JAMES S. TAGLIAFERRI,
PATRICIA CORNELL, and
BARRY B. FEINER,

        Defendants.

## COMPLAINT AND JURY DEMAND

### Introduction

1.    This is an action by plaintiffs, Matthew J. Szulik, individually and as trustee of

the Kaitlin Szulik Trust, the Brendan Szulik Trust, and the Keenan Szulik Trust, Kyle M. Szulik,

and Raymond W. Szulik (collectively, the "Szuliks") (1) for constructive fraud/breach of

fiduciary duty, an accounting, violations of Section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. §78j, and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, violations of the

Investment Advisers Act of 1940, 15 U.S.C. §80b-1 *et seq.*, violations of the North Carolina

Investment Advisers Act, N.C. Gen. Stat. §78C-1 *et seq.*, fraud, negligence, negligent

misrepresentation, conspiracy, breach of implied covenant of good faith and fair dealing, and breach of contract against TAG Virgin Islands, Inc. (formerly Taurus Advisory Group, LLC) ("TAG VI"), James S. Tagliaferri ("Tagliaferri"), and Patricia Cornell ("Cornell") (collectively, the "TAG Defendants"), and (2) for legal malpractice, aiding and abetting breach of fiduciary duty, conspiracy, and fraud against Barry B. Feiner ("Feiner").

2.     From 1996 until 2009, the TAG Defendants were the Szuliks' trusted family friends, counselors, and investment advisers.

3.     For many of those thirteen years, the TAG Defendants, for the most part, invested the Szuliks' money in a diversified portfolio of actively traded securities, consisting of mostly blue-chip stocks and bonds — consistent with the Szuliks' stated investment objectives of capital preservation and conservative growth.

4.     Beginning in or about 2007, the TAG Defendants, upon information and belief, in combination with Jason Galanis ("Jason Galanis" or "Galanis"), Feiner, and others, defrauded the Szuliks by, among other things, using the Szuliks' money *not* for the Szuliks' benefit, but for their *own* benefit. Specifically, the TAG Defendants, without the Szuliks' consent, used approximately $60 million of the Szuliks' money, more than half of their entire portfolio, to make investments outside the scope of the authority granted by the Szuliks, to fund loans to persons involved in illicit or potentially illegal activities, and to fund and gain control of companies having little to no earnings, poor prospects, and weak and incompetent management. Without notifying the Szuliks or federal authorities, the TAG Defendants also received millions in kickbacks, and, upon information and belief, obtained other benefits, in exchange for "investing" the Szuliks' money in these corrupt companies.

2

5.     Through these schemes, the TAG Defendants and, upon information and belief, Galanis, were able to take control of the companies in which they "invested" the Szuliks' millions, and, unbeknownst to the Szuliks, were able to direct funds to themselves, including approximately $1.6 million in kickbacks disguised as undefined and virtually non-existent "consulting" work for one of the companies. While the TAG Defendants engaged in these improper activities, they continuously took fees from the Szuliks for making and "managing" these "investments."

6.     The TAG Defendants, upon information and belief, were able to hide their illicit activities by providing fraudulent, inadequate, and incomprehensible documentation to the Szuliks and to the financial institutions which acted as custodians of the Szuliks' accounts. This conduct made it difficult, if not impossible, for the Szuliks to track the various transactions being made on their behalf or to discover the TAG Defendants' wrongdoing.

7.     The TAG Defendants were aided in their wrongful acts by a number of individuals, including Feiner, a New York attorney.

8.     As a result of the TAG Defendants' wrongdoing, the Szuliks have lost approximately $60 million.

9.     In this action, the Szuliks seek recovery of their losses, punitive damages, restitution, and their costs, including attorneys' fees.

### Parties

10.     Plaintiffs Matthew J. Szulik, Kyle M. Szulik (Matthew's wife), and Raymond W. Szulik (Matthew's father) are individuals who reside in Raleigh, North Carolina.

11.     Matthew Szulik has at all times relevant to this action been trustee of the Kaitlin Szulik Trust, the Brendan Szulik Trust, and the Keenan Szulik Trust. The beneficiaries of these trusts are Matthew and Kyle Szulik's children.

3

12.     Defendant TAG VI (formerly Taurus Advisory Group, LLC) is a corporation, upon information and belief, organized under the laws of the United States Virgin Islands with its principal place of business at 1336 Beltjan Road, Turnick Building, Suite 202, St. Thomas, VI 00802.

13.     Defendant Tagliaferri is an individual whose principal residence is, upon information and belief, in either Connecticut or the U.S. Virgin Islands.

14.     Defendant Cornell is an individual whose principal residence is in Connecticut.

15.     Defendant Feiner is an individual whose principal residence is in New York.

**Jurisdiction and Venue**

16.     Federal jurisdiction is predicated on (a) 28 U.S.C. §1332 because the amount in controversy in this matter exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states, and (b) 28 U.S.C. §1331 because the action arises under the laws of the United States.

17.     Venue is predicated on 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**General Allegations**

**Initial Relationship between Matthew Szulik and the TAG Defendants**

18.     Matthew Szulik has known Tagliaferri for approximately 25 years. They met by way of a pickup basketball game in the 1980s in Ridgefield, Connecticut, when Mr. Szulik was just beginning his career.

19.     Matthew Szulik and Tagliaferri developed a close friendship. Mr. Szulik consulted Tagliaferri with respect to financial issues.

20.     Tagliaferri and Cornell became family friends of Matthew Szulik and his wife, Kyle. Tagliaferri and Cornell attended Szulik family functions in North Carolina, including

4

events relating to the Szuliks' young children. When Mr. Szulik's father-in-law passed away, Tagliaferri and Cornell traveled to North Carolina to attend the funeral. The Szulik children, until recently, referred to Tagliaferri as "Uncle Jim."

21.     As a result of years of friendship in the 1980s, 1990s, and early 2000s, the Szuliks viewed Tagliaferri and Cornell as trusted friends and advisers.

## The Investment Management Agreement

22.     In March 1996, the Szuliks began their professional relationship with the TAG Defendants via Taurus Advisory Group, LLC ("Taurus"), later TAG VI, by entering into an Investment Management Agreement (the "IMA"). *See* Szulik/TAG Investment Management Agreement, appended hereto as **Exhibit A**. Tagliaferri and Cornell were principals of Taurus and are the principals of TAG VI. Cornell signed the IMA on TAG VI's behalf.

23.     Under the terms of the IMA, the TAG Defendants were limited in their investment authority to "make purchases, sales, and otherwise effect [sic] transactions in stocks, bond [sic], and other securities." In exchange for their management of the Szuliks' money, the TAG Defendants were entitled to an annual fee, payable quarterly, of 1% of the assets under management.

24.     The Szuliks' portfolio in the early years of the IMA was less than $10 million. During the early stages of the professional relationship, the TAG Defendants were in frequent contact and made semi-annual visits to the Szuliks' home in North Carolina to review the Szuliks' portfolio.

25.     The main objective of the Szuliks' investment strategy, as communicated to the TAG Defendants, was preservation of capital and conservative growth to be achieved primarily through investment in blue-chip stocks and bonds.

26.     With respect to Raymond Szulik, Matthew Szulik's 96-year-old father, preservation of capital and liquidity were of the utmost importance. The importance of Raymond Szulik's money being at all times invested in liquid assets was communicated to and understood by the TAG Defendants. As of December 31, 2009, less than 5% of Raymond Szulik's portfolio was liquid.

27.     Beginning in approximately 2000, the Szuliks' income started to grow substantially, and the Szuliks entrusted much of this income to the TAG Defendants.

28.     Until approximately mid-2006, the Szuliks' portfolio entrusted to the TAG Defendants exceeded $60 million and was substantially invested in high quality stocks and bonds.

29.     After mid-2006, the TAG Defendants, without notifying the Szuliks, began liquidating the Szuliks' more conservative investments and placed much of those funds in suspect, high-risk, illiquid securities, as well as real estate and personal loan instruments that the TAG Defendants had no authority to acquire under the IMA.

30.     The Szuliks did not begin to become aware of some of these inappropriate investments or the inappropriate character of some of these investments until mid-to-late 2008. Moreover, the Szuliks did not become aware of certain individuals' involvement in many of the investments, including Galanis, Feiner, and others, the illicit activities of some of the companies, or the kickbacks received by the TAG Defendants until 2009 or 2010.

31.     The inappropriate investments made by the TAG Defendants include, but are not limited to, the following:

(i)     **Conversion Services International, Inc.**

32.     Conversion Services International ("Conversion Services") was formerly named LCS Group, Inc. It purports to be in the business of data warehousing and business intelligence

6

consulting. Except for a small profit in 2009, Conversion Services has lost money every year since its merger with LCS Group in 2004. Conversion Services' most recent Form 10-K indicates as much and also notes that independent auditors have expressed substantial doubt about its ability to continue as a going concern.

33. The TAG Defendants invested the Szuliks' money in Conversion Services' securities at a cost of no less than $18,608,052. The majority of these securities were purchased between April 2006 and July 2008. The securities, upon information and belief, are essentially worthless.

34. Scott Newman ("Newman") was CEO of Conversion Services and is currently its chairman of the board. In 2006, the TAG Defendants loaned approximately $400,000 of the Szuliks' money to Newman. The Szuliks have never seen documents evidencing this loan, but, upon information and belief, the loan was non-recourse and was secured with worthless Conversion Services' equities. The loan ended up in default with the Szuliks never having received payments on interest or principal from Newman. When the Szuliks became aware of the loan, they demanded of the TAG Defendants that they liquidate it. As a result, the Szuliks were told by Tagliaferri that an unknown buyer had purchased it at its $400,000 face value. The Szuliks were not paid the interest that had accrued since the issue date. To date, according to Mr. Newman, Mr. Newman has not repaid the principal or any interest on the note either to the Szuliks or to its new holder.

(ii)     **International Equine Acquisitions Holdings, Inc.**

35. International Equine Acquisitions Holdings, Inc. ("IEAH"), founded in 2003, operates principally thoroughbred horse racing stables. IEAH has had a history of inadequate corporate management, has been repeatedly cited or sued for failing to pay its bills, and has been investigated by the SEC.

36.     The TAG Defendants invested the Szuliks' money in IEAH corporate bonds, equities, and other assets at a cost of no less than $19,498,000. These investments were made between September 2007 and December 2008. These investments are highly illiquid and, upon information and belief, are essentially worthless.

37.     As discussed in detail below, IEAH, through Michael Iavarone ("Iavarone"), entered into agreements with the TAG Defendants that provided the TAG Defendants with kickbacks in excess of $1.6 million in exchange for the TAG Defendants giving millions of dollars of the Szuliks' money to IEAH.

38.     Upon information and belief, the TAG Defendants caused IEAH to terminate its auditors around the time that the TAG Defendants began to take kickbacks from IEAH. In addition, the TAG Defendants arranged to have their associates Allan Farber ("Farber") and Richard Adelson ("Adelson") appointed as directors of IEAH in order to enable the TAG Defendants to assert control over IEAH.

### (iii)     Paseo de la Reforma Partners, LLC

39.     Paseo de la Reforma Partners, LLC ("Paseo") is a Nevada LLC associated with Jared Galanis, brother of Jason Galanis. In October 2006, the TAG Defendants "invested" the Szuliks' money in a Paseo note at a cost of $3,750,000. The TAG Defendants have attempted to sell the note in response to the Szuliks' demand that they do so. The TAG Defendants have been unable to arrange a sale, suggesting that the note is essentially worthless.

40.     The note is secured by a deed of trust on property in Mexico City located at 35 Paseo de la Reforma. This property, upon information and belief, is affiliated with Penthouse Media Group ("Penthouse"), a company in the pornography and adult entertainment business, and Galanis, among others. Among the several business located in the property are a so-called gentlemen's club called Bleu Club and a members-only club associated with Penthouse called

The Club at Penthouse. The Szuliks would not have knowingly permitted the TAG Defendants to invest their funds with entities in this line of business.

### (iv) Protein Polymer Technologies, Inc.

41.     Protein Polymer Technologies, Inc. ("PPTI") describes itself as a technology company having as its business the attempted use of protein polymer technology and materials in various medical markets.

42.     The TAG Defendants used the Szuliks' money to acquire PPTI equities and debt instruments at a cost of no less than $9,352,689. These securities were purchased between October 2005 and July 2008. These securities, upon information and belief, are essentially worthless.

43.     In its Form 10-K for the fiscal year ending December 31, 2008 filed with the SEC, PPTI reported: (a) that it has "incurred operating losses since [its] inception in 1988 and will continue to do so for at least several more years," and (b) that PPTI's auditors have expressed "substantial doubt about [PPTI's] ability to continue as a going concern."

44.     Upon information and belief, the TAG Defendants forced PPTI to accept Feiner as their counsel. In addition, the TAG Defendants arranged to have their associates, including Farber and Adelson, appointed as directors of PPTI. *See* PPTI website archive from June 2008, appended hereto as **Exhibit B**.

### (v) Loans to Certain Individuals

45.     In addition to making a personal loan to Newman, as set forth above, the TAG Defendants made several other similar loans from the Szuliks' account. Andrew Cohen ("Cohen") received an approximately $1 million loan, Marvin Ceder ("Ceder") received an approximately $675,000 loan, and Wilmslow, LLC, an entity controlled by Peter Neary ("Neary"), received an approximately $500,000 loan.

9

46.     Cohen was one of IEAH's first investors and introduced IEAH to Paul Brown, who would later become a director of IEAH. Upon information and belief, Cohen also introduced IEAH to the TAG Defendants. In addition, upon information and belief, rather than paying the $1 million loan back, Cohen transferred his ownership interest in a horse named Frost Giant to the TAG Defendants, and the TAG Defendants and Cohen now consider the debt to have been satisfied.

47.     The Neary loan was made to Wilmslow, LLC—a Florida LLC of which Neary was managing member. This loan was secured by a mortgage on residential property at 3040 North Bay Drive in Miami Beach, Florida. Wilmslow purchased the property from Ceder for approximately four times what Ceder had paid just a few years prior, a price far in excess of its appraised value. Feiner drafted the mortgage documents and acted as counsel to the TAG Defendants "as agent" in the transaction.

48.     The Newman loan, as set forth above, was a personal loan made to the CEO of Conversion Services—a company into which the TAG Defendants put millions of dollars of the Szuliks' money.

49.     Upon information and belief, all loans made to these and other individuals with the Szuliks' money by the TAG Defendants were either personal loans in the style of the Newman loan or loans secured by mortgages on residential property in the style of the Neary loan. The IMA did not authorize the TAG Defendants to engage in such transactions. Specifically, these loans were (a) not authorized, (b) not disclosed to the Szuliks at the times made, (c) not made for legitimate investment purposes to benefit the Szuliks, but instead made to the TAG Defendants' associates for their own benefit, and (d) in any event, not managed for the benefit of the Szuliks.

### (vi) 1920 Bel Air, LLC

50.     1920 Bel Air, LLC is, like Paseo, a Nevada LLC associated with Jared Galanis,

Jason Galanis' brother. The TAG Defendants loaned $900,000 of the Szuliks' money to 1920 Bel

Air, LLC, and the loan was secured by a deed of trust over residential property located at 1920

Bel Air in California.

51.     1920 Bel Air, LLC was or is, upon information and belief, 99% owned by

Fernando Molina, a Mexican billionaire associated with Penthouse, and 1% owned by Jason

Galanis. The property was, upon information and belief, managed by Jason Galanis and Chandra

Galanis—Jason Galanis' mother and wife of convicted white-collar criminal John Peter Galanis

("John Galanis"), who is Jason's and Jared's father.

52.     Like the personal loans made with the Szuliks' money by the TAG Defendants,

the loan to 1920 Bel Air, LLC was, upon information and belief, a mortgage on residential

property (in addition to being a suspect investment). As such, the TAG Defendants were not

authorized under the IMA to execute the transaction.

53.     Matthew Szulik learned of this use of his funds when he was served with a

complaint issued out of the Bankruptcy Court for the District of Nevada in or around February

2007. After Mr. Szulik raised concerns with the TAG Defendants, he was extricated from the

"investment" and his money was returned. The Szuliks later learned that Feiner facilitated the

TAG Defendants' extrication of the Szuliks' money from 1920 Bel Air, LLC.

### Kickbacks to TAG Defendants from IEAH

54.     IEAH, based in Garden City, New York, is, as noted above, in the thoroughbred

race horse business – an industry in which neither Tagliaferri nor Cornell had any experience

prior to their investment of the Szuliks' (and perhaps others') money in IEAH in 2007. The TAG

Defendants at one time asserted control over IEAH by virtue of investments they made and managed on their clients' behalf.

55.     Prior to Iavarone becoming CEO of IEAH, he was fined and suspended from selling securities by the NASD when he worked on Wall Street selling penny stocks in the 1990s. One of his employers, A.R. Baron, now defunct, pleaded guilty to enterprise corruption after 13 former employees were convicted of or pleaded guilty to using lies, unauthorized trades, and theft to defraud investors of at least $75 million from 1991 to 1996. *See New York Times* article, May 29, 2008, appended hereto as **Exhibit C**.

56.     The TAG Defendants invested at least approximately $20 million of the Szuliks' money in IEAH in 2007 and 2008. The Szuliks were not aware of the investments at the time they were made.

57.     The Szuliks were not informed, prior to the TAG Defendants' investing millions of dollars of their money, that the CEO of IEAH, Iavarone, had been employed by a company that actively engaged in securities fraud or that Iavarone himself had been fined and suspended by the NASD. The Szuliks were first exposed to Iavarone's past around the time the above-referenced *New York Times* article was published. Tagliaferri arranged a conference call between Matthew Szulik, Iavarone, and Tagliaferri. During this call, Tagliaferri assured Mr. Szulik that he should trust Iavarone. Up to this point, Tagliaferri had been a trusted family friend and adviser, and the Szuliks believed his representation.

58.     The Szuliks were never informed that the TAG Defendants, in addition to receiving management fees for managing the Szuliks' money in IEAH, also received kickbacks from IEAH including the following:

**Secret TAG Payments/Kickbacks from IEAH**

| Date | Invoice # | Amount |
|---|---|---|
| 3/21/2007 | 100 | 50,000 |
| 3/31/2007 | 105 | 125,000 |
| 4/20/2007 | 111 | 50,000 |
| 5/18/2007 | 214 | 150,000 |
| 6/11/2007 | 220 | 150,000 |
| 7/3/2007 | 237 | 120,000 |
| 7/17/2007 | 285 | 187,500 |
| 8/16/2007 | 345 | 180,000 |
| 9/4/2007 | 346 | 60,000 |
| 11/29/2007 | 471 | 50,000 |
| 1/8/2008 | 520 | 142,500 |
| 1/18/2008 | 539 | 80,000 |
| 3/26/2008 | 635 | 60,000 |
| 4/28/2008 | 689 | 225,000 |
| | | **$1,630,000** |

*See* Copies of Invoices, appended hereto as **Exhibit D**. The Szuliks were never requested to give, and never did give, consent to these payments. The payments from IEAH to the TAG Defendants were not made for the purported services listed on the invoices, but instead were made in exchange for the TAG Defendants providing the Szuliks' money to IEAH.

      59.    The kickback arrangement between the TAG Defendants and IEAH involved several components:

      a.    The TAG Defendants and IEAH would enter into a convertible note agreement. *See, e.g.*, 3/21/07 Note Agreement, appended hereto as **Exhibit E**. These agreements would generally provide for a front-end five percent or ten percent "consulting fee" that would be paid "off the top." *See* Affidavit of Michael Iavarone, appended hereto as **Exhibit F**. In the case of the $1 million 3/21/07 Note Agreement, the TAG Defendants received $50,000 and wired, through Feiner, $950,000 to IEAH. *See* 3/23/07 Wire Transfer, appended hereto as **Exhibit G**.

b. The note agreements also generally provided a second, back-end, fee if the note was converted from debt into IEAH equity. In the case of the 3/21/07 Note Agreement, the TAG Defendants received $50,000 upon conversion of the debt into equity. *See* Notice of Right to Convert dated 4/15/08, appended hereto as **Exhibit H**. The TAG Defendants structured the note agreements so that they would have the decision-making authority with respect to conversion to the exclusion of the Szuliks whose funds were used for the investments. It was understood by IEAH that conversion rights would be exercised on all notes. Given the expense of maintaining debt and IEAH's financial condition, it was in IEAH's best interest, but not the Szuliks' best interest, that notes be converted. *See* Affidavit of Michael Iavarone, appended hereto as **Exhibit F**.

c. Each note had a corresponding Security and Inducement Agreement. *See, e.g.,* Security and Inducement Agreement for 3/21/07 Note, appended hereto as **Exhibit I**. The funds provided to IEAH were often used to purchase horses. These Security and Inducement Agreements would grant either a five percent or ten percent interest to the TAG Defendants, as the Secured Party, in the particular horse to be purchased. In the case of Exhibit I, the TAG Defendants were given a 5% interest in the horse named Kip Deville. The various interests in horses received by the TAG Defendants were transferred to Pegasus Holdings Group Stables, LLC, of which Tagliaferri was or is managing member. On one occasion, the TAG Defendants were to receive an interest in a horse named Yellowstone as an inducement. Upon information and belief, IEAH did not

purchase Yellowstone and instead made a cash payment to the TAG Defendants in lieu of the ownership interest in the horse.

60.     In Spring 2008, the TAG Defendants sent to IEAH the invoices attached hereto as Exhibit D. These invoices were backdated in order to attempt to disguise the kickbacks received by the TAG Defendants, after the fact, so that they appeared to be payments for consulting services. *See* Affidavit of Michael Iavarone, appended hereto as **Exhibit F**. For example, IEAH received in Spring 2008, within the bundle of fourteen backdated invoices, an invoice dated 3/21/07 for $50,000. This invoice was intended to correspond to the 3/21/07 Note Agreement even though it was mailed to IEAH over one year after the TAG Defendants took the $50,000 kickback.

61.     The various "services" listed on each of the invoices were not actually provided to IEAH. Rather, these invoices reflect kickbacks that the TAG Defendants received for providing the Szuliks' money to IEAH. *See* Affidavit of Michael Iavarone, appended hereto as **Exhibit F**.

62.     Feiner assisted the TAG Defendants' receipt of kickbacks, other payments, and inducements, by drafting all the necessary documents involved in these transactions. In addition to drafting documents, Feiner acted as the TAG Defendants' agent in wiring the Szuliks' money to IEAH.

## The TAG VI-Galanis-Feiner Connection

63.     The Szuliks were unaware of the TAG Defendants' association with several questionable individuals including, among others, Galanis and Feiner. The TAG Defendants operate within a vast network of suspect associations, which include individuals and entities. The TAG Defendants are careful to avoid direct connections with their associates and instead operate through a maze of entities. Through these entities, the TAG Defendants and individuals

like Galanis, Feiner, and others, engage in the type of illicit activity described throughout this Complaint.

64.     Galanis, who is extensively involved in the on-line pornography business, has been and, upon information and belief, *is*, associated with the activities of his father, John Galanis. John Galanis, after conviction in 1988, was sentenced to 27 years in prison for his role in racketeering activities. In 2001, John Galanis was permitted to participate in a prison work-release program and subsequently disappeared. Since then, news reports have indicated that John Galanis has been involved in the business activities of his son, Jason Galanis.

65.     In 2007, Galanis was permanently enjoined from violating various federal securities laws, fined, and barred from serving as an officer or director of a public company for a period of five years when he settled claims of accounting fraud and financial reporting violations brought by the SEC.

66.     The Szuliks would not have approved investments made on their behalf that were associated with Galanis or his agents, associates, or entities that he controls. The Szuliks would not have approved any Galanis involvement in the management of their investments.

67.     Unbeknownst to the Szuliks, the TAG Defendants, as described earlier in the Complaint, used $3.75 million of the Szuliks' money to make a loan to Paseo, a Nevada LLC, which is, upon information and belief, controlled by Jason Galanis and Jared Galanis. The loan to Paseo is secured by a deed of trust (*see* **Exhibit J**, appended hereto) to Paseo de la Reforma No. 35 in Mexico City (the "Mexico City property"). As set forth above, the Mexico City property houses a club associated with Penthouse, which is, upon information and belief, controlled in part by, or associated with, Galanis.

16

68.     Also unbeknownst to the Szuliks, the TAG Defendants loaned $900,000 of the Szuliks' money to 1920 Bel Air, LLC, an entity, upon information and belief, also controlled by Jason Galanis and Jared Galanis.

69.     Upon information and belief, Jason Galanis and Jared Galanis are also associated with IEAH. Jared Galanis and his company Jamsfield Investments attempted to solicit offers for the purchase of 51% of IEAH. To that end, they prepared a presentation in concert with the TAG Defendants. The presentation claimed falsely that Matthew Szulik was Chairman of IEAH and that Tagliaferri was IEAH's "primary investor." Upon information and belief, the TAG Defendants introduced Jason Galanis to Iavarone and Richard Schiavo ("Schiavo"), who at the time was IEAH's co-CEO and co-president along with Iavarone.

70.     The TAG Defendants, as indicated above, have directed almost $50 million of the Szuliks' money to IEAH ($19.5 million), Conversion Services ($18.6 million), and PPTI ($9.3 million). By making these large investments of Szulik funds, the TAG Defendants were able to obtain control of these companies.

71.     The TAG Defendants also gained control over companies by forcing certain individuals into important positions within certain companies. For instance, the TAG Defendants, upon information and belief, forced PPTI to accept Feiner as their counsel. In addition, the TAG Defendants installed their associates, including Farber and Adelson, as directors of both PPTI and IEAH. Shortly after Farber and Adelson were appointed as directors of IEAH, Iavarone and Schiavo were forced to resign their positions as co-CEOs. Contemporaneous with these resignations, Farber was appointed as the chairman of the board. Upon information and belief, Iavarone and Schiavo were forced to resign so that the TAG Defendants, with the aid of Farber and Adelson, could exert control over IEAH.

72.     Feiner, at Tagliaferri's direction, and without the Szuliks' knowledge, acted as counsel to PPTI, the TAG Defendants, and the Szuliks with respect to the extension of a loan previously made to PPTI by the TAG Defendants with the Szuliks' money. *See* Note Repayment Agreement and PPTI website archive from June 2008, appended hereto as **Exhibit B**. The Szuliks have never met or had any dealings with Feiner.

73.     Upon information and belief, the TAG Defendants, without informing the Szuliks, arranged for Feiner to act as counsel to PPTI, the TAG Defendants, and the Szuliks, so that the TAG Defendants could conduct illicit transactions and conceal them from the Szuliks.

74.     Feiner was also associated with the TAG Defendants' investment of the Szuliks' money in Conversion Services. A Conversion Services 2008 10-Q filing indicated that Feiner acted as the Szuliks' counsel with respect to a $200,000 stock purchase. This was done without the Szuliks' knowledge or consent. Feiner was also involved in a transaction between Conversion Services and the TAG Defendants where the Szuliks and the "Feiner Family Trust" (Feiner as trustee) were "purchasers" with respect to a registration rights agreement, also without the Szuliks' knowledge or consent.

75.     Feiner drafted convertible note agreements with IEAH that allowed the TAG Defendants to take kickbacks for investing the Szuliks' money in IEAH. Feiner also communicated with Schiavo with respect to the note agreements. Upon information and belief, the TAG Defendants pressured IEAH into paying Feiner's legal fees associated with drafting these documents. IEAH paid in excess of $50,000 to Feiner on invoices he addressed to TAG VI. These invoices were often in round numbers and usually included only a summary narrative, such as "legal services performed for TAG Virgin Islands, Inc." In addition, Feiner acted as the TAG Defendants' agent with respect to wiring the Szuliks' money to IEAH.

76. As set forth above, Feiner prepared mortgage documents and acted as counsel to the TAG Defendants "as agent" with respect to the Neary loan transaction.

77. Upon information and belief, Feiner has been and continues to be associated with John Galanis and Jason Galanis. For example, Feiner represented John Galanis in connection with a criminal matter, subsequent civil matters, or both in the 1980s and 1990s. Feiner was also involved with 1920 Bel Air, an entity associated with Galanis. Without the Szuliks' knowledge or consent, Feiner was substituted as trustee with respect to a deed of trust that secured a note the TAG Defendants made on the Szuliks' behalf.

## Discovery of the TAG Defendants' Wrongdoing

78. In December 2007, Matthew Szulik retired as CEO of a major public company. Prior to Mr. Szulik's retirement, the Szuliks met with Tagliaferri to discuss their investment objectives in light of Mr. Szulik's decision to step down. Kyle Szulik stressed, once again, that their investment objective was security and monthly income, and that this objective was all the more important now that Mr. Szulik would no longer be receiving a salary. Tagliaferri told the Szuliks that they would be able to extract $1 million annually from their portfolio, while still leaving a substantial estate for each of their children.

79. When Matthew Szulik no longer had the day-to-day demands of leading a large public company during 2008, he focused more of his attention on the Szuliks' financial and estate planning. Mr. Szulik was concerned with the then current composition of the portfolio that the TAG Defendants had made on the Szuliks' behalf. The investments were difficult to track and Mr. Szulik felt there was a lack of transparency. In addition, the occasional statements Mr. Szulik had received were incomplete and unintelligible. Calls were made to Tagliaferri for additional information, but they were infrequently returned and Tagliaferri's tone became hostile.

80.     The Szuliks recently have learned that the financial institutions acting as custodians of the Szuliks' assets possess only as much information and documentation as was provided by the TAG Defendants. The TAG Defendants provided inadequate documentation to these custodians with respect to the source, destination, and use of funds flowing into and out of the Szuliks' investment accounts. Moreover, cash deposits and withdrawals were not recorded in a timely manner. As such, investment transactions cannot easily or accurately be matched with the corresponding cash effect. Upon information and belief, the TAG Defendants' failure to provide adequate documentation to the custodians helped hide the TAG Defendants' wrongful conduct.

81.     In September 2008, the Szuliks retained a new investment adviser and informed the TAG Defendants of their decision. The TAG Defendants were informed that notes under the TAG Defendants' management were to be liquidated unless they would mature within six months. Moreover, the TAG Defendants were instructed that no future investment decisions were to be made without the Szuliks' approval.

82.     The Szuliks' new investment adviser obtained further information regarding the Szuliks' portfolio. She explained to the Szuliks that many of the companies invested in were far too risky, illiquid, and the investments did not take into account the Szuliks' short- and long-term needs. There were major concentrations in too few investments and little information to be gathered on many of the holdings. She learned that several notes held by the Szuliks, in addition to those issued by PPTI, IEAH, and the other entities listed above, were in default.

83.     From late 2008 through the middle of 2009, the Szuliks repeatedly requested that $10 million be transferred from their TAG VI account to their new adviser's control. This transfer was neither completely nor timely made.

84.     In April 2009, Tagliaferri and Cornell visited the Szuliks at their home in North Carolina. The Szuliks again raised concerns with how the TAG Defendants had made use of their funds. The Szuliks also raised concerns with certain individuals associated with several of these investments, including Galanis, among others. The TAG Defendants offered no explanation and subsequently failed to return phone calls or provide requested information.

85.     In July 2009, the Szuliks, by letter to the TAG Defendants, terminated the IMA. Tagliaferri acknowledged the termination and asked for an opportunity to change the Szuliks' minds.

86.     Notwithstanding the termination of the IMA, the TAG Defendants continued to conduct themselves as if the IMA were still in effect. On one occasion, the TAG Defendants, without the Szuliks' consent, executed a note extension agreement with PPTI which extended the maturity date of a note made in 2006. *See* Note Extension Agreement dated 9/21/09, appended hereto as **Exhibit K**. At this point, the amount of the note was approximately $6.5 million as its maturity date had been extended several times and it had been amended several times, all to the detriment of the Szuliks.

87.     The Szuliks continued to have difficulty dealing with the TAG Defendants when, in 2009, the TAG Defendants failed to transmit data to the Szuliks' accountant at tax time as they had in previous years. This caused substantial problems for the Szuliks in the preparation of their 2008 tax return. In addition, the Szuliks were told that the TAG Defendants would have a difficult time providing from the Szuliks' account the $1.8 million necessary to pay the Szuliks' taxes. At the time, the TAG VI account supposedly held approximately $69 million of the Szuliks' assets.

88.     From 2009 through the beginning of 2010, the TAG Defendants represented that they would arrange for the sale and distribution of proceeds of some of the questionable investments they made, including PPTI, among others. These transactions never occurred. Upon information and belief, the TAG Defendants represented that they would arrange these transactions as a delaying tactic. As a result of the TAG Defendants' delays and unfulfilled promises, Matthew Szulik, among other things, missed certain business opportunities and the Szuliks were delayed in seeking appropriate legal relief.

89.     Matthew Szulik exercised reasonable diligence with respect to his investments made through the TAG Defendants and had no suspicions regarding those investments until 2008. While the Szuliks' suspicions of the TAG Defendants' activities and associations have grown from approximately 2008, the Szuliks did not have actual evidence of the TAG Defendants' wrongdoing until February 2010 when they received copies of invoices from Marjorie Roberts, a former attorney of the TAG Defendants, showing kickbacks made to TAG VI by IEAH. *See* Roberts Letter of February 22, 2010, appended hereto as **Exhibit L**.

### Count I
### (Constructive Fraud / Breach of Fiduciary Duty)

90.     The Szuliks reallege paragraphs 1 through 89 as if fully set forth here.

91.     The Szuliks confided trust and confidence in the TAG Defendants by placing their assets under the TAG Defendants' supervision and giving the TAG Defendants broad discretion to make investment decisions. The TAG Defendants therefore owed a fiduciary duty to the Szuliks and occupied a position of trust and confidence.

92.     The TAG Defendants breached their fiduciary duty and took advantage of their position of trust and confidence in a number of ways. First, the TAG Defendants advanced their own interests at the expense of the Szuliks' interests by placing the Szuliks' money in, among

22

other things, companies having little to no earnings, poor prospects, and weak and incompetent management, as well as residential real estate mortgages and personal loans to various individuals, including people associated with the above-referenced companies. Upon information and belief, the TAG Defendants used or intended to use some of these companies to engage in securities fraud schemes. Upon information and belief, the TAG Defendants took advantage of their position of trust and confidence in order to receive additional benefits for themselves for many "investments" made on the Szuliks' behalf, including benefits derived from these companies and the individuals who received personal loans.

93.    Second, the TAG Defendants advanced their own interests at the expense of the Szuliks' interests by, among other things, accepting without the Szuliks' knowledge or consent, kickbacks and other payments from IEAH in exchange for investing the Szuliks' money in IEAH. The TAG Defendants intended to take kickbacks prior to their investing any of the approximately $20 million of the Szuliks' money which they placed in IEAH. The TAG Defendants created a conflict of interest and took advantage of their position of trust and confidence in order to benefit themselves by taking kickbacks and other payments in exchange for investing the Szuliks' money in IEAH.

94.    The TAG Defendants also concealed material facts from the Szuliks, including, among other things, the TAG Defendants' arrangement to take kickbacks from IEAH, the TAG Defendants' association with individuals with past securities violations, including Iavarone and Galanis, and, upon information and belief, their funding of their own or their associates' businesses with the Szuliks' money.

95.    The Szuliks now hold essentially worthless securities and other "investments" that were made not to further the Szuliks' investment objectives, but rather to allow the TAG

Defendants' to take kickbacks and for other improper purposes. The Szuliks have accordingly suffered damages as a result of the TAG Defendants' conduct, and seek, among other things, the imposition of a constructive trust.

## Count II
### (Accounting)

96. The Szuliks reallege paragraphs 1 through 95 as if fully set forth here.

97. As set forth above, the TAG Defendants owed a fiduciary duty to the Szuliks and breached that duty.

98. Throughout the course of the professional relationship between the Szuliks and the TAG Defendants, the TAG Defendants did not appropriately account for transactions made on the Szuliks' behalf. In addition, the TAG Defendants provided inadequate documentation to the financial institutions acting as custodians of the Szuliks' accounts.

99. As a result, the occasional statements that the Szuliks were provided were unclear and effectively prevented the Szuliks from understanding the nature of transactions being made on their behalf or discovering the TAG Defendants' wrongdoing.

100. The Szuliks repeatedly have demanded records more accurately reflecting their account activity from the TAG Defendants and their various counsel. Each time the TAG Defendants or their counsel have denied the request or have failed to provide all requested documents.

101. As a result of the above, it is impossible for the Szuliks to understand fully the holdings in their accounts or the extent of the TAG Defendants' breach of fiduciary duty and other possible wrongdoing without a court-ordered accounting.

## Count III
### (Violation of SEC Rule 10b-5)

102. The Szuliks reallege paragraphs 1 through 101 as if fully set forth here.

103. This claim arises under Section 10(b) of the Securities Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. § 78j, and Rule 10b-5 promulgated under the '34 Act by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

104. As set forth above, the TAG Defendants took kickbacks and other payments from IEAH during, at least, 2007 and 2008. This was the same period of time in which the TAG Defendants were investing the Szuliks' money in IEAH corporate bonds, equities, and other assets. The TAG Defendants failed to disclose their arrangement with IEAH to the Szuliks. Knowledge of such an arrangement and its associated implications would be vital for any prudent investor to consider before making an investment decision. As such, this failure constitutes a material omission.

105. As set forth above, the TAG Defendants owed the Szuliks a fiduciary duty and, as such, had a duty to disclose the material omission to the Szuliks. The Szuliks relied on, and were injured by, the TAG Defendants' material omission. The Szuliks' reliance was justified in light of the fiduciary duty owed by the TAG Defendants and the long relationship between the TAG Defendants and the Szuliks.

106. The TAG Defendants attempted to make an after-the-fact disclosure of their arrangement with IEAH to the Szuliks in September 2008. At this point the damage was done as the TAG Defendants had already taken approximately $1.6 million in kickbacks from IEAH, and the Szuliks were left with approximately $20 million in illiquid and essentially worthless IEAH securities. The TAG Defendants' ineffective attempt to disclose their dealings with IEAH and to disguise the payments as consulting fees after-the-fact demonstrate that the TAG Defendants were aware of the wrongful nature of their kickback arrangement with IEAH as it related to their investment of the Szuliks' money.

25

107. The TAG Defendants intended that they be paid on one side by their clients, the Szuliks, for the "management" of the Szuliks' money, and also that they be paid on the other side by the company into which they invested their clients' money. Moreover, the TAG Defendants had a clear opportunity to carry out their objective since they had broad discretion over the investment of the Szuliks' money under the IMA.

108. Had they been informed at the outset, the Szuliks would not have agreed to have their money invested in an entity in which their investment advisers, the TAG Defendants, stood to receive kickbacks and had such patent conflicts of interest. It was therefore necessary for the TAG Defendants to omit material information in order to carry out their objective of investing the Szuliks' money in IEAH, taking kickbacks from IEAH in return, and collecting management fees from the Szuliks.

109. The Szuliks' currently hold IEAH corporate bonds, equities, and other assets valued at $0 but which cost the Szuliks nearly $20 million. They would not have otherwise possessed these holdings, or the losses associated with them, if the TAG Defendants had revealed all material information that they were required to disclose.

110. Upon information and belief, Tagliaferri either directly or indirectly controlled TAG VI, Cornell, and Feiner with respect to this violation. Accordingly, Tagliaferri is jointly and severally liable under 15 U.S.C. §78t for all violations of SEC Rule 10b-5 that TAG VI, Cornell, and Feiner committed.

111. The TAG Defendants used the instrumentalities of interstate commerce, including the mails and telephone wires, to carry out their objective.

112. The above conduct constituted the employment of a manipulative or deceptive device in connection with the purchase or sale of a security within the meaning of the '34 Act and Rule 10b-5.

## Count IV
## (Violation of Investment Advisers Act of 1940)

113. The Szuliks reallege paragraphs 1 through 112 as if fully set forth here.

114. This claim arises under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*

115. As set forth above, for over a decade the TAG Defendants, for compensation in the form of management fees, advised the Szuliks with respect to purchasing, selling, and otherwise investing in securities. As such, the TAG Defendants are investment advisers within the meaning of 15 U.S.C. §80b-2(a)(11).

116. The TAG Defendants employed a device, scheme, or artifice to defraud the Szuliks, and engaged in transactions that operated as a fraud or deceit upon the Szuliks by, among other things, taking kickbacks in exchange for investing the Szuliks' money, using the Szuliks' money as their own by making, without appropriate authorization under the IMA, substantial loans to friends and associates, some of whom were involved with entities in which they placed the Szuliks' money, and, upon information and belief, using the Szuliks' money to fund their own or their associates' businesses or to facilitate other schemes. The TAG Defendants achieved their objective through the use of false statements and material omissions, as set forth above.

117. The TAG Defendants used the instrumentalities of interstate commerce, including the mails and telephone wires, to carry out their objective.

118.     As a result of the above conduct, the TAG Defendants violated 15 U.S.C. §80b-6. The TAG Defendants' violation or violations rendered the IMA void under 15 U.S.C. §80b-15, and the Szuliks are therefore entitled to restitution of fees paid under the IMA.

## Count V
### (Violation of North Carolina Investment Advisers Act)

119.     The Szuliks reallege paragraphs 1 through 118 as if fully set forth here.

120.     This claim arises under the North Carolina Investment Advisers Act, N.C. Gen. Stat. §78C-1 *et seq.*

121.     As set forth above, for over a decade the TAG Defendants, for compensation in the form of management fees, advised the Szuliks with respect to purchasing, selling, and otherwise investing in securities. As such, the TAG Defendants are investment advisers within the meaning of N.C. Gen. Stat. §78C-2(1).

122.     The TAG Defendants employed a device, scheme, or artifice to defraud the Szuliks, and engaged in transactions that operated as a fraud or deceit upon the Szuliks by, among other things, taking kickbacks in exchange for investing the Szuliks' money, using the Szuliks' money as their own by making, without appropriate authorization under the IMA, substantial loans to friends and associates, some of whom were involved with entities in which they placed the Szuliks' money, and, upon information and belief, using the Szuliks' money to fund their own or their associates' businesses or to facilitate other schemes. The TAG Defendants achieved their objective through the use of false statements and material omissions, as set forth above. This conduct was in violation of N.C. Gen. Stat. §§78C-8(a)(1), (a)(2), or both.

123.     Upon information and belief, Tagliaferri either directly or indirectly controlled TAG VI, Cornell, and Feiner with respect to this violation. Accordingly, Tagliaferri is jointly

and severally liable for all violations of N.C. Gen. Stat. §§78C-8(a)(1), (a)(2), or both, that TAG VI, Cornell, and Feiner committed.

124.     As a result of the above conduct, the Szuliks' are entitled to recover their damages, to receive restitution of fees paid under the IMA, together with interest, and to recover their costs, including reasonable attorneys' fees.

## Count VI
## (Fraud)

125.     The Szuliks reallege paragraphs 1 through 124 as if fully set forth here.

126.     In the IMA, and statements made by the TAG Defendants, the TAG Defendants represented that they would manage the Szuliks' money on behalf of the Szuliks and for their benefit.

127.     This representation was false as the TAG Defendants, as set forth above, used the Szuliks' money not for the Szuliks' benefit but for their own benefit by, among other things, taking kickbacks from entities in which they placed the Szuliks' money, and, upon information and belief, for other improper uses such as funding other businesses and entities or facilitating other schemes associated with the TAG Defendants or their associates, including Galanis and others.

128.     The TAG Defendants, including in their communications with the Szuliks and otherwise, also concealed facts from the Szuliks that they were required to disclose by virtue of the fiduciary duty they owed and by virtue of the statements and other representations they made concerning investments. Among the facts concealed were the TAG Defendants' arrangement to take kickbacks from IEAH, the TAG Defendants' association with individuals with past securities violations, including Iavarone and Galanis, and, upon information and belief, their funding of their own or their associates' businesses with the Szuliks' money.

29

129.    The Szuliks would not have permitted their money to be used for such improper purposes had they not been deceived. It was therefore necessary for the TAG Defendants to falsely represent or conceal certain facts in order for the TAG Defendants to complete their fraud. The TAG Defendants were longtime friends and, for several years, trusted advisers, were bound by a contract, and owed the Szuliks a fiduciary duty. The Szuliks accordingly relied upon and acted upon the TAG Defendants' representations and concealment of facts.

130.    The Szuliks' reliance on the TAG Defendants' false representations and concealment of facts allowed the contract to remain in effect to the Szuliks' detriment thereby allowing the TAG Defendants to carry out their fraud and resulted in the Szuliks holding essentially worthless securities, both of which caused damages to the Szuliks.

## Count VII
### (Negligence)

131.    The Szuliks reallege paragraphs 1 through 130 as if fully set forth here.

132.    By virtue of the TAG Defendants' control over the Szuliks' money and their special relationship with the Szuliks, the TAG Defendants owed the Szuliks a duty to exercise reasonable care in the management of the Szuliks' money.

133.    In the alternative, and at a minimum, the TAG Defendants' conduct as described throughout this Complaint was negligent. The TAG Defendants breached their duty to act with reasonable care by, among other things, taking kickbacks from IEAH in return for the investment of the Szuliks' money, upon information and belief, other businesses or activities associated with the TAG Defendants or their associates, including Galanis, and making unsuitable investments, as discussed above, on the Szuliks' behalf which were contrary to the Szuliks' stated investment objectives.

134.    The TAG Defendants concentrated the Szuliks' money in too few investments, most of which were illiquid. In assembling the Szuliks' portfolio, the TAG Defendants neither observed ordinary, prudent investing standards, nor the Szuliks' stated investment objectives.

135.    The Szuliks would not have held or otherwise been involved with investments in which their investment advisers took kickbacks or in generally unsuitable or questionable investments had the TAG Defendants exercised reasonable care in the management of the Szuliks' money. As such, the Szuliks suffered damages as a result of the TAG Defendants' conduct.

**Count VIII**
**(Negligent Misrepresentation)**

136.    The Szuliks reallege paragraphs 1 through 135 as if fully set forth here.

137.    As set forth above, the TAG Defendants owed the Szuliks a fiduciary duty, and, as a result, were obligated to disclose material facts to the Szuliks. In the alternative, and at a minimum, the TAG Defendants' conduct as described throughout this Complaint constituted negligent misrepresentation.

138.    The TAG Defendants, as part of their obligations as investment advisers, often provided information to the Szuliks in the form of statements and during the course of discussions held at the Szuliks' North Carolina home and over the phone.

139.    The TAG Defendants, while acting in the course of their business as investment advisers, and for payment in the form of management fees, supplied fraudulent, inadequate, and incomprehensible information to the Szuliks with respect to the holdings in their account. Moreover, the TAG Defendants failed to provide the Szuliks with material facts during the course of their regular visits to the Szuliks' North Carolina home. Upon information and belief,

the TAG Defendants selectively provided information to the Szuliks in order to carry out their objective of defrauding the Szuliks.

140.    The TAG Defendants concealed material facts from the Szuliks including, among other things, the TAG Defendants' arrangement to take kickbacks from IEAH, the TAG Defendants' association with individuals with past securities violations, including Iavarone and Galanis, and, upon information and belief, their funding of their own or their associates' businesses with the Szuliks' money.  By providing some but not all material facts to the Szuliks, the TAG Defendants failed to exercise reasonable care in the dissemination of this information to the Szuliks.

141.    The TAG Defendants were for many years the Szuliks' family friends and trusted advisers.  In addition, the TAG Defendants owed fiduciary duties to the Szuliks.  The Szuliks were therefore justified in relying on the TAG Defendants' misrepresentations.  As a result of their reliance, the Szuliks now hold illiquid and virtually worthless securities and have suffered damages.

## Count IX
## (Breach of Implied Covenant of Good Faith and Fair Dealing)

142.    The Szuliks reallege paragraphs 1 through 141 as if fully set forth here.

143.    The Szuliks and the TAG Defendants were parties to the IMA, appended hereto as **Exhibit A**.  Under the IMA, the Szuliks promised to pay an investment management fee of 1% of the money under management, payable quarterly, and the TAG Defendants promised to manage the Szuliks' money and make investments on their behalf.

144.    The laws of the State of Connecticut govern the IMA.  Connecticut implies in every contract an implied covenant of good faith and fair dealing.

145.    The Szuliks reasonably expected that the TAG Defendants would invest the Szuliks' money for the Szuliks' benefit and would assemble a prudent portfolio, consistent with the Szuliks' stated investment objectives, to achieve that end.

146.    As set forth above, the TAG Defendants arranged to take kickbacks for investing the Szuliks' money in certain entities. They also used the Szuliks' money as their own by making loans to friends or associates, some of whom were involved, directly or indirectly, with entities in which the TAG Defendants invested the Szuliks' money. More generally, the TAG Defendants failed to observe standards of prudent investing and failed to respect the Szuliks' stated investment objectives by assembling a portfolio that concentrated the Szuliks' money in too few, mostly illiquid, investments. The purpose of making such investments was not to benefit the Szuliks, but rather to benefit the TAG Defendants and their associates through kickbacks and other improper benefits.

147.    As such, the Szuliks were deprived of the benefits they reasonably expected to receive under the IMA and accordingly suffered damages.

### Count X
### (Breach of Contract)

148.    The Szuliks reallege paragraphs 1 through 147 as if fully set forth here.

149.    The Szuliks and the TAG Defendants were parties to an IMA. Both Matthew and Kyle Szulik signed the contract, and Cornell signed on behalf of TAG VI.

150.    Under the IMA, the Szuliks were obligated to pay the TAG Defendants management fees in the amount of 1% of assets under management, payable quarterly. The Szuliks performed their obligations and made all payments required under the IMA.

151.    Under the IMA, the TAG Defendants were given broad, but not unrestricted, discretion to make appropriate investments. The TAG Defendants were not, however,

33

authorized to make investments in personal loans to the TAG Defendants' associates and residential mortgages on property associated with the TAG Defendants or their associates. The TAG Defendants breached the IMA by making these "investments."

152.    These "investments" deprived the Szuliks of the opportunity to invest in appropriate securities. As such, the Szuliks have suffered damages.

## Count XI
## (Legal Malpractice)

153.    The Szuliks reallege paragraphs 1 through 152 if fully set forth here.

154.    Feiner was counsel to PPTI during, at least, 2007 and 2008. During this period, the TAG Defendants made investments in PPTI on the Szuliks' behalf.

155.    Also during this period, Feiner acted as counsel to the TAG Defendants, who were the Szuliks' agents, and simultaneously purported to act as counsel to the Szuliks with respect to the TAG Defendants' investment of Szulik funds in PPTI.

156.    This putative representation was not intended to benefit the Szuliks. Instead, Feiner's purported representation was intended solely to further the TAG Defendants-Feiner conspiracy, set forth below, and was also a necessary step in carrying out the conspiracy's objective of defrauding the Szuliks.

157.    By acting as counsel to the TAG Defendants and PPTI while also purportedly acting as counsel to the Szuliks, Feiner breached his duty to exercise reasonable care and skill with respect to his purported representation of the Szuliks. At a minimum, Feiner should have known that this representation raised conflicts of interest, and he did not ask for the Szuliks' consent to this representation.

158.    Had the Szuliks been adequately represented with respect to transactions executed on their behalf with PPTI they would not hold illiquid and essentially worthless investments in

34

PPTI. Accordingly, Feiner caused at least approximately $6.5 million of damage to the Szuliks by, at a minimum, facilitating the Note Repayment transaction. *See* Note Repayment Agreement, appended hereto as **Exhibit B**.

## Count XII
### (Aiding and Abetting Breach of Fiduciary Duty)

159. The Szuliks reallege paragraphs 1 through 158 as if fully set forth here.

160. Feiner was, upon information and belief, aware of the fiduciary relationship between the Szuliks and the TAG Defendants.

161. Upon information and belief, the TAG Defendants installed Feiner as PPTI legal counsel. The TAG Defendants then, upon information and belief, utilized Feiner's position to engage in unsuitable securities transactions in breach of their fiduciary duty to the Szuliks.

162. By way of his position as PPTI's legal counsel, Feiner, upon information and belief, assisted the TAG Defendants' breach of fiduciary duty by making unsuitable investments in, or loans to, PPTI. Through his association with the TAG Defendants, Feiner, upon information and belief, also assisted the TAG Defendants' breach of fiduciary duty by helping them make unsuitable investment in, or loans to Conversion Services and 1920 Bel Air, among other entities.

163. Feiner drafted note agreements with IEAH which, as discussed in detail above, provided kickbacks to the TAG Defendants. In addition, also as detailed above, Feiner acted as the TAG Defendants' agent with respect to the wiring of the Szuliks' money to IEAH. By drafting these documents and otherwise acting as the TAG Defendants' agent with respect to these transactions with IEAH, Feiner substantially aided the TAG Defendants' breach of fiduciary duty.

164.    Accordingly, Feiner is liable to the Szuliks for the full amount of the Szuliks' losses caused by the TAG Defendants' investments in, or loans to, the above entities.

## Count XIII
### (Conspiracy)

165.    The Szuliks reallege paragraphs 1 through 164 as if fully set forth here.

166.    Feiner and the TAG Defendants, upon information and belief, worked in concert and agreed to use the Szuliks' money for their own benefit.

167.    The TAG Defendants were given broad discretion over the Szuliks' money under the IMA and, upon information and belief, worked in concert with Feiner and others to funnel the Szuliks' money into questionable investments, including, among others, IEAH, PPTI, Conversion Services, and 1920 Bel Air.

168.    The TAG Defendants, upon information and belief, breached their fiduciary duty to the Szuliks by way of this conspiracy and by so acting in concert with Feiner to further their own interests at the expense of the Szuliks' interests. Feiner substantially aided the TAG Defendants' breach of fiduciary duty by, among other things, drafting legal documents which provided the TAG Defendants with kickbacks and purporting to represent the Szuliks in certain securities transactions.

169.    As a result of the Feiner-TAG Defendants conspiracy, the Szuliks now hold illiquid and essentially worthless investments and have accordingly suffered damages.

## Count XIV
### (Fraud Against Feiner)

170.    The Szuliks reallege paragraphs 1 through 169 as if fully set forth here.

171.    Feiner failed to disclose to the Szuliks his purported representation of them with respect to certain securities transactions involving PPTI, among other entities.

172. Upon information and belief, Feiner concealed this fact from the Szuliks so that he and the TAG Defendants could benefit from this and other transactions at the Szuliks' expense. This putative representation was not intended to benefit the Szuliks. Instead, Feiner's purported representation was intended solely to further the TAG Defendants-Feiner conspiracy, and was also a necessary step in carrying out the conspiracy's objective of defrauding the Szuliks.

173. As a result of Feiner's conduct, the Szuliks now hold illiquid and essentially worthless investments and have accordingly suffered damages.

WHEREFORE, the Szuliks respectfully request that the Court:

A.     enter Judgment in their favor in the minimum amount of $60 million against all defendants, jointly and severally;

B.     award them punitive damages, pursuant to N.C. Gen. Stat. § 1D *et seq.*, against all defendants, jointly and severally;

C.     award them restitution of fees paid under the IMA, together with interest, against the TAG Defendants, jointly and severally;

D.     award them damages for lost earnings and lost business opportunities;

E.     grant them an accounting;

F.     award them their costs, including attorneys' fees;

G.     impose a constructive trust in favor of the plaintiffs and against all defendants; and

H.     grant them such other relief as is just and proper.

### **Jury Demand**

Plaintiffs demand a jury on all issues so triable.

37

On this _____ day of December, 2010.

Respectfully submitted,

MATTHEW J. SZULIK, individually and as trustee of the KAITLIN SZULIK TRUST, the BRENDAN SZULIK TRUST, and the KEENAN SZULIK TRUST, KYLE M. SZULIK, and RAYMOND W. SZULIK

By their attorneys,

_____ /s/ Gordon P. Katz _____
Gordon P. Katz
   MA Bar No. 261080
   gordon.katz@hklaw.com
Daniel I. Small
   MA Bar No. 467160
   daniel.small@hklaw.com
Michael J. Stromsnes
   MA Bar No. 675539
   michael.stromsnes@hklaw.com
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116-3889
(617) 523-2700
Fax (617) 523-6850

John L. Brownlee
   VA Bar No. 37358
   john.brownlee@hklaw.com
HOLLAND & KNIGHT LLP
1600 Tysons Boulevard, Suite 700
McLean, VA 22102
(703) 720-8600
Fax (703) 720-8610

- and -

_____ /s/ Pressly M. Millen _____
Pressly M. Millen
   NC Bar No. 16178

38

pmillen@wscr.com
Burley B. Mitchell, Jr.
    NC Bar No. 3040
    bmitchell@wscr.com
WOMBLE CARLYLE
SANDRIDGE & RICE, PLLC
150 Fayetteville Street, Suite 2100
Post Office Box 831
(919) 755-2100
Fax (919) 7550-6067